Morrison, &c. *vs.* Thurman, &c.          Case 27.

APPEAL FROM JEFFERSON CIRCUIT.          ORD. PET.

1. When the calamity of one person, produced without his fault, causes an injury to the rights of another, the latter can maintain no action, except for the unnecessary continuance of the injury by the wrongful neglect of the former—and for the real injury.
2. One who is navigating a river may, without incurring responsibility to the owner of the soil on the shore, cable his vessel to a tree or other permanent object, to secure his vessel against danger; or even for convenience do the same thing, being responsible for all in-

Morrison, &c.
vs.
Thurman, &c.

jury that may arise from negligence or want of skill, not interfering with the actual occupancy of the owner of the soil

3. The owner of land on the bank of a navigable river has no exclusive right to the use of the soil covered by the water.

4. That an individual navigating the Ohio stopped his coal boat over a log-way which the plaintiff, the owner of the adjacent soil, had projected into the river, was not an act of which the plaintiff could complain, except for the mere entry on land to cable to the shore, if the plaintiff was entered upon while using the rail-way himself, and if while there the boat was sunk by unavoidable casualty, without fault of the owner, damages for any obstruction to plaintiff's use of his log-way could not be recovered.

[The facts of the case are set out in the opinion of the court, so far as is necessary to a correct understanding of the principles involved and decided, and more particularly stated in the former opinion referred to in this opinion, reported in 14 *B. Monroe*, 367. —Rep.]

*James Speed* for appellant—

This case was heretofore in this court. In the opinion then rendered I understand the court to have decided these three propositions:

1st. That the owner of the boat was liable for injury to plaintiff's log-way, unless the injury happened as incident to lawful right of navigation.

2d. That defendant had no right to land his boat, *unnecessarily*, at a bank appropriated to private use. And,

3d. And if in the first instance justified by necessity in landing, the continuation, after warning, was a wrong.

Upon the trial of the case it appeared that the coal boats were intended to be carried through the canal, around the falls of the Ohio, to the lower country. They had been brought in the evening to Porter's landing, just below Thurman's log-way, in order to be carried through the canal the next day. At Porter's landing they did not interfere with Thurman's log-way. On the next day the wind blew so strong from the Indiana shore that the boats could

not go out with safety to themselves or the boats lying along the shore below; then the river commenced to freeze. When at Porter's landing the boats lay, with some empty flat boats, betwixt them and the shore, having their bows into the shore, and their sterns quartering out. In that position the current brought the ice against the sides of the boats—their weakest part. The position of the boats was changed; their bows were carried out and up stream, so that the ice would come against the bows. An effort was also made by those in charge of the boats to carry them to a point above Thurman's landing, which they thought safer than where they were. They failed in this effort, because of the ice and sunk logs. The boats were frozen up opposite Thurman's log-way. They remained there, sparred out and diligently watched by the crew till the ice broke up, when they were wrecked and sunk at the foot of Thurman's log-way and across it.

All the testimony concurs that they were wrecked in spite of all possible efforts to save them; indeed, it appears that no human effort could have saved them. A man in the employment of Thurman as log man to the mill, says that on the day the boats first took their position opposite the log-way, he warned off the man in charge of the boats, and he thinks he could have dropped elsewhere with safety. The pilots in charge thought otherwise. The boats were not put there originally as a matter of choice or convenience to the owner, nor did they remain there from choice or convenience; they were stopped and detained from necessity, and were wrecked by inevitable casualty. The boats sunk in January. When they sunk they went clear out of sight. They were not in Thurman's way till the river fell, in May.

The owner proceeded to remove them, but it could not be done without interruption to Thurman's log-way, and was not done as fast or as promptly as he required.

The first question to be ruled in this case is, whose duty was it to remove the boats?

When this case was in this court before, the question was to the extent of the rights of the riparian owner—the servitude or right of servitude, as owner of the bank, he had to the river, and to the waters thereof—the attention and mind of the court was called to the question upon a complaint from the riparian owner that his rights had been needlessly or wantonly violated by the navigator. Looking at the opinion from that point, and in that view, I not only bow to it as authority, but say that it is right.

The case now presents itself upon a complaint from the navigator—the wrecked navigator. He says that when wrecked by an overwhelming power in front of Thurman's property, he has been denied his right of servitude in the adjacent bank, and been made to pay for injuries which no human power could have prevented.

I further think, that the opinion heretofore delivered, if made to apply to such a case as this, is wrong. The opinion then given was not upon the case now before the court.

The third position in the opinion, which is, that if justified in the first instance by necessity in landing, the continuation after warning was a wrong. I think the court meant that *a boat*, not *a wreck*, could be warned off. The court did not mean to say that if a boat is wrecked at the foot, or on the bank, of a riparian owner, that the owner of the bank can give notice to the owner to remove it, and if he fails to do so as promptly as the riparian owner *thinks* he should do, that he can quietly fold his arms and charge the owner of the wreck with all his loss.

The owner of the river bank has an interest in removing the wreck equal to that of the owner; he cannot say that the unfortunate navigator shall not only bear all the losses from storms and casualty that befal him alone, but where the loss is mutual he must bear not only his own, but that of the owner of the bank.

I think the owner of the bank becomes bailee of the wrecked boats, in so far as his interest and necessity requires. He may take charge of the wreck, and it is his duty to do so in as far as it may be necessary to remove it. He cannot make the condition of the wrecked boats worse. And it seems to me that if, in discharging this duty, he should do more than his interest required, and be of benefit to the owner of the wreck, he might make a charge in the nature of salvage.

The instructions by the court were not consonant to these views.

The court is referred to the following authorities: 3 *Kent*, 521–2–3–4, and *Angel on Water Courses*, sections 552–3.

July 2.

Chief Justice Marshall delivered the opinion of the court on the 23d January, 1856, but suspended by a petition for a re hearing, which was subsequently overruled.

This case having formerly come before the court, on an appeal from a judgment against the plaintiffs, on a demurrer to the petition, which was adjudged to be insufficient by the circuit court, the opinion of this court had reference only to the facts as presented in the petition. And, although these facts rendered it necessary to discuss and decide several questions, applying to the rights of riparian owners on the one side, and of navigators of the stream on the other, there was no attempt to apply the principles evolved, to any other state of case than that which was presented by the petition, which, in the opinion of this court, made out a good cause of action.

The facts thus presented were, that the plaintiffs, being rightfully in possession of a portion of the shore and bank of the Ohio river, had appropriated their shore to the uses of their saw mill, on the top of the bank, and for a landing, at which logs were received, to be taken to the mill for sawing, and had constructed, from the mill into the river, log-ways, along which, by the aid of machinery, the logs were taken from the water's edge to the mill; and that

the defendants had landed two heavily laden coal boats at the shore of the plaintiffs thus appropriated, and of which the appropriation and use were, as the court assumed, indicated by the log-ways; that the boats lay across and over the foot of the log-ways extending into the river, and thus obstructed the use of them; and that after warning to the defendants the boats were still continued in the same position, until, by reason of carelessness and mismanagement, and of the want of sufficient crews to take care of the boats, they sunk, and thus continued, and in fact increased the obstruction to the use, by the plaintiffs, of their shore and log-ways, and of their mill; and that the defendants, though requested and promising to remove the sunken boats, failed to do so in reasonable time, or to use proper diligence for that purpose.

The court decided that the appropriation and use of the shore by the plaintiffs, as indicated by the facts, being, so far as appeared, no impediment to the public right of navigation, was lawful; that the navigator has no right, at his pleasure, to land upon the adjacent banks, the property of private individuals, for such purposes and for such time as he may choose, and no right wantonly to obstruct the riparian owner in the use of the adjacent river and bank, for such useful purposes as are not detrimental to the public right; and that the defendants had no right unnecessarily to land their boats at the bank and landing of the plaintiffs, thus appropriated by them, and no right to lay their boats across the log-ways of the plaintiffs, nor even at the foot of them, whether above or below low-water mark, so as to obstruct the use of them; and that if their acts might at first be justified by necessity or excused by ignorance, the continuation of them after warning was itself a wrong, injurious to the rights of the plaintiffs, and aggravated by being prolonged by the sinking of the boats. The conclusion was, that upon the face of the petition, these injuries being without excuse, and

having produced damage to the plaintiffs, constituted a cause of action and ground of recovery. (See *Thurman, &c., vs. Morrison, &c.,* 14 *B. Monroe,* 367, 375–6.)

It will be seen that in the former opinion the court did not undertake to define, affirmatively, the rights which the navigator has with reference to the banks of a public navigable river, but rather to define, with reference to the facts of this case, the rights of the riparian owner, and to notice the acts of the navigator inconsistent with those rights, and which, being without excuse, and productive of actual loss or damage, constituted a cause of action. It is implied, however, that necessity might justify or ignorance excuse, the landing of the boats at the plaintiffs' shore, and the laying of them across his log-ways. And it must be understood, that although the continuation of these acts, after warning, could not be excused on the ground of ignorance, it might be justified on the ground of necessity. It is to be observed, too, that the sinking of the boats, though attributed in the petition to the fault and mismanagement of the defendants, and charged to have increased as well as prolonged the obstruction, is spoken of merely as aggravating the wrong of not removing them after warning. The effect of failing to remove the sunken boats with reasonable dispatch, is not particularly noticed. But even if the defendants were innocent of fault up to the time of the sinking of their boats, it was their duty, if they knew that they obstructed the plaintiffs in the use of their log-ways and landing, either to abandon the boats and their cargoes, as soon as it was in their power to make the election, giving notice to the plaintiffs, or to remove the obstruction with reasonable diligence and dispatch; being responsible in the last case for nothing more than for the actual loss accruing to the plaintiffs, by the continuance of the obstruction beyond the period reasonably necessary for its removal, in the manner ordinarily used in such cases, and by

1. When the calamity of one person, produced without his fault, causes an injury to the rights of another, the latter can maintain no action, except for the unnecessary continuance of the injury by the wrongful neglect of the former—and for the real injury.

means within the power of the defendants. The petition states a failure in this respect, and a consequent loss or damage to the plaintiffs, which, even if the defendants were chargeable with no previous fault, would render them liable to an action.

But where the calamity of one person, produced without his fault, causes an injury to the rights of another, the latter can maintain no action, except for the unnecessary continuance of the injury by the wrongful act or neglect of the former. And even where the calamity which produces the injury is caused by mere misjudgment or indiscretion in the exercise of a right, the action should be regarded as one *stricti juris*, founded on actual wrong, and limited to a recovery for actual damage, produced by that wrong It would seem unreasonable to deny that the exigencies of navigation may be such as to justify, to a certain extent, such use of the banks of a public navigable river, though they be private property, as would, under ordinary circumstances, be a trespass on the close of the owner. But it is difficult to state in precise terms the nature of the exigencies which may constitute this justification, or the extent to which the rights of individual property may be overborne by them. Necessity, which is at once a sufficient cause and a proper limit of the justification, though in the strictest sense it admits of no alternative but that which is absolutely essential to the end in view, and without which it could not exist or be obtained, is a word which, in its ordinary use, admits of far greater latitude, embracing, according to the circumstances of the case, various degrees of urgency, and even of convenience. And in determining whether an act which, abstractly considered, would be an invasion of the legal rights of another, is or is not justified by any existing necessity, not only the circumstances under which it is done, and by which it is induced, but also the nature and extent of the injury or damage involved in and fol-

lowing from it, as well as the care or want of care with which it is done, must be taken into view.

Where the injury is slight and merely ideal or legal, unaccompanied by actual damage, as the mere entry upon the close of another, a slight necessity, amounting only to convenience, being sufficient to repel any inference of wanton or willful injury, if it be not a justification in law, is at least an excuse, which, upon common principles of humanity and comity, gives immunity to that which, in contemplation of law, may be a wrong. The traveller, whether on foot, or on horseback, or in a carrriage, who finds the public highway impassable, is justified by necessity in passing through the enclosed grounds of the neighboring proprietor. But the same condition of the road which might justify or excuse the foot passenger in thus using or passing upon the soil of another, might neither justify nor excuse such an invasion of private property by persons travelling with horses and carriages. A navigator who makes fast his boat to a tree upon a woodland shore, can hardly be deemed guilty of a wrong, though it be done for some purpose of convenience only, and not to avoid impending danger. And certainly he has a right in circumstances of difficulty and danger incident to the navigation in which he is engaged, to provide for the safety of his vessel by mooring it at any vacant part of the shore, using as much caution to avoid injury to others as circumstances will allow, and being responsible for any actual damage which may arise to another from his own positive acts, or from his want of proper skill or care. We are to be understood as using the word justification, or excuse, in a sense which does not affect this responsibility. And although in the exercise of this right, founded in necessity, the navigator may have fastened his vessel to a private shore, and laid her upon a part of the river commonly used by the riparian proprietor, yet, if in this use of the shore, which is private property, and of the river, of which he has the right to use for

MORRISON, &c.
vs.
THURMAN, &c.

2. One who is navigating a river may, without incurring responsibility to the owner of the soil on the shore, cable his vessel to a tree or other permanent object, to secure his vessel against danger; or even for convenience do the same thing, being responsible for all injury that may arise from negligence or want of skill, not interfering with the actual occupancy of the owner of the soil.

the purposes and incidents of navigation every part not in the actual occupation and use of some one else, he has done nothing more than was reasonably necessary for the safety of his vessel, and has committed no actual present damage to the property of the riparian proprietor, and has not interfered with his actual use and enjoyment of it, nor interrupted his current actual use at the time of the adjacent portion of the river, ordinarily occupied for his own purposes, the navigator is thus far innocent of blame, and so long as the position of his boat, assumed from necessity, is retained under a similar necessity, he continues to be equally blameless, unless, upon being apprised that the boat, in the position in which he has placed it, actually prevents or obstructs the appropriate use of the shore and adjacent river by the riparian owner, or that its continuance in that position will do so, he wrongfully neglects to remove it, when he could do it by ordinary exertion, and without unreasonably exposing the vessel to increased danger.

The justice of these principles, in the terms in which they have been stated, would probably not be denied. But it is apparent from the examples which have been given, that these terms are too indefinite to form a precise rule, and that in the application of the principles to particular cases, much must be left to the discretion of those who are to decide. That discretion cannot be justly exercised but upon a calm consideration of all the facts, with a view to the question whether the acts or conduct of the navigator of which complaint is made, were justified by an existing necessity, and whether he has used such caution and such exertion to avoid injury to others, as, under the circumstances, a due regard to their rights and interest required. And these questions resolve themselves practically into the enquiry, whether he has done what other navigators, engaged in similar business and possessing competent experience and ordinary skill and discretion, would or might have done, or would deem proper to be done, in the

same circumstances. This criterion, subject to the judgment and discretion of those who are to decide the question of responsibility, is the nearest and most precise test which we can suggest for determining—not whether the navigator is to be held responsible for actual damage done to riparian property, caused either necessarily, or by negligence in the effort to save his vessel—but whether he is to be regarded as a mere wrong-doer, who, having invaded the property of others without excuse, is responsible for all the consequences of his wrong, though caused or enhanced by superhuman agency, acting upon his boat in the situation in which he improperly placed it, or whether having acted with reasonable discretion, skill, and diligence, in placing his boat in that position and in continuing her there, until by inevitable casualty she was sunk, he is to be held no further liable for all that occurred before the sinking of the boat, than if, instead of being sunk, it had then been moved on in the prosecution of its voyage, and to be liable afterwards only for the actual damage caused by the sunken boat, after the wreck and cargo might, by the use of ordinary diligence, have been so removed as to cause no damage.

The statements of the petition, if true, would show that the sinking of the boats in this case was attributable to the neglect, mismanagement, and insufficiency of the crews, and therefore it was regarded in the former opinion as an aggravation of the wrong, assumed upon the statements of the petition, to have been previously committed. But the answer denies, and the evidence disproves, the statements of the petition on this subject, and upon the case as now presented, the conclusion is authorized that such reasonable precautions and exertions as the circumstances seemed to require, were in fact used to prevent the catastrophe. Whether this was in fact done, was a question to be decided by the jury, with such aid from the opinions of men experi-

enced in the management of boats of this sort, under similar circumstances, as the evidence before them might furnish. And the question being one on which the extent of the subsequent duty and liability of the defendants might depend, it should have been placed distinctly before the jury, with the advice, (which, in principle, is applicable generally to the acts and course of the defendants,) that even if the boats might possibly have been saved from sinking, by the use of other means than those which were adopted, yet if the precautions and exertions actually used were such as might reasonably be deemed sufficient, and were deemed to be so by the persons having charge of the boats, their being sunk notwithstanding the use of such means, is to be attributed to inevitable casualty, and not to the fault of the navigators.

Assuming that this casualty was not caused by the neglect or fault of the defendants, then, unless by their previous conduct they had made themselves liable for all consequences which might ensue from the position in which they had placed their boats, in reference to the property of the plaintiffs, they were only bound to use ordinary diligence in removing the obstruction to the rights of the plaintiffs, caused by the sunken boats, and were only liable under that responsibility for the loss or damage caused by the continuance of the obstruction, after it might have been so removed. It remains then to enquire, whether they had, by their previous conduct, made themselves liable to a greater extent than this, for the consequences of the disaster; or rather, to consider with reference to the facts, the principles to be applied in the determination of this question.

The boats had been brought from a coal region above, and were destined for a market below the falls of the Ohio, which were to be passed by means of the Louisville canal. They were in charge of a pilot of twenty years' experience in the management of coal and flat boats. Arriving in the night near

the head of the canal, they were landed at Porter's landing, just below the lease-hold property of the plaintiffs. On the next day, the canal being occupied by steam boats, and the wind being too high for these flat boats to proceed on their voyage, they were not moved from Porter's landing, where they remained for two or three days, in consequence of the continued high wind, which still prevented their proceeding on their voyage. On the third day it had turned very cold, and ice began to be formed in the river, and the manager of these boats, considering them to be in an unsafe position, in consequence of their sides being exposed to the current, by reason of the position of other boats at the same landing, determined, for reasons which he states to move them a short distance up, instead of down the stream; which was done by cordelling. He says his intention was to have moved them above the log-way, and perhaps the ground of the plaintiffs, but he was prevented by ice and sunk logs from doing so; and he fastened them to the plaintiffs' shore by lines, the boats being in the river, partly over, or at the foot of the log-way. In this situation they seem to have been detained by the ice until it broke up, when, notwithstanding the effort, by means of spars, to keep the bows up stream to meet the current and the ice, the spars were broken, the bows forced in towards the shore, and the sides yielding to the force of the ice and current, the boats immediately sunk.

The assistant manager and conductor of the boats, also an experienced navigator, makes substantially the same statements of facts and opinions, and there is no contradiction, except that some witnesses are of opinion that when the boats were moved up to the shore of the plaintiffs, they might have been taken to a place of equal safety, without interfering with the rights of the plaintiffs. But they show that it would have been extremely difficult, if not impossible, to find a place of real safety. If we are to judge from the event, the boats might as well have

remained at Porter's landing, where they could not have met a worse fate than that which actually befel them. And we suppose if they had been sunk there, they would not have interfered with the logway of the plaintiffs. But this is not the proper test of the duties or liabilities of the defendants, whose agents, if they have even judged erroneously as to what was most expedient. do not appear to have acted with any other view than that of preserving their boats, nor under any other motive than that of avoiding danger. They were not looking out for a place in which their boats might be sunk with the least possible injury to others, but for a place in which they might, and, as was hoped, would with reasonable care, be safe from the expected danger. And the question is not whether they acted under an imperious necessity, nor whether under circumstances admitting a choice of alternatives, they adopted that which, in view of all the facts, may now be considered as the wisest; but whether. under the existing circumstances, the tying of the boats to the private shore or landing of the plaintiffs, where they lay on the water, over or at the foot of the log-way, was at most any thing more than a violation of the close of the plaintiffs, under a necessity which, if it did not justify or excuse, at least so far mitigated the wrong, as to exempt the defendants from liability for consequential damage, not arising directly from this act. nor from any further act or neglect of themselves or their agents.

The plaintiffs have no right to question the propriety of moving the boats up instead of down the river from Porter's landing, unless they shew that it was done with a view to injure them. If, as the manager of the boats says, their removal to a place above the log-way was impeded and prevented by sunken logs, belonging presumably to the plaintiffs, they have little right to complain that the boats were stopped at a point beyond which their progress was prevented by obstructions which the plaintiffs themselves had placed

in the river. And if, there being no such obstructions, the position of the boats was chosen with a view to convenience and safety, under circumstances rendering it necessary that they should be fastened to the shore, of which there seems to be no doubt. there is no proof that the plaintiffs were actually using their log-way at the time, or that they were prevented from, or obstructed in, any intended or practicable use of them at any time before the sinking of the boats. The state of the weather and of the river authorizes the inference that if the boats had not been there the plaintiffs would not and could not have used it, from the time when the boats were placed there until they were sunk by the ice; and that even then, they caused no obstruction to the use of the log-way, until the river had fallen so that logs could not be floated over the boats.

If this be so, the position of the boats, until they sunk, caused no actual or immediate damage or loss to the plaintiffs, was no encroachment upon their soil, nor any invasion of their rights, and cannot in itself be deemed a wrong to them which would make the defendants liable for the damage caused by the sinking of the boats. And this is true, whether they sunk above or below low-water mark. For although the soil between high and low-water mark, may have been the close of the plaintiffs, the river itself, at every stage of water, was free to the public for navigation and its incidents, and every part not actually occupied at the time, was for these purposes open to the occupation of any individual. The plaintiffs themselves, although they were entitled to the exclusive use of their log-way, and although they may have endeavored to secure to themselves the exclusive use of the adjacent river, could acquire no right to use the river inconsistent with the public right, and could appropriate it to their own exclusive purposes only by actual use, and no longer than that use should continue. But as their use of the river for the purpose of supplying logs for their mill, is not

3. The owner of land on the bank of a navigable river has no exclusive right to the use of the soil covered by the water.

necessarily inconsistent with the common right, and may be regarded as a part of it, the obstruction of that use, except in the exercise of the common right of navigation and its incidents, would be an injury to them for which they might have an action. No part of the river belonged to them except while they were actually using it, and the occupation of any part of it, however near to their log-way, and though its actual use might be thereby obstructed, with consequent loss or damage, would be no injury to them, if it occurred in the lawful exercise of the common right or its incidents. And if it occurred otherwise, and even wantonly, it would be no injury unless it interrupted the actual, or intended, and otherwise practicable, use of the log-way, or the adjacent river. In the first case there would be damage without injury; in the last case there would be no injury, because there would be no damage.

So long, therefore, as the boats were afloat in the river, and until after they were sunk, their position in the river, though directly over or at the foot of the log-way, was not an injury or wrong to the plaintiffs, and if they might have maintained an action for entering upon their shore and tying a cable there, they could have recovered nothing on account of the position of the boats. Being placed there for safety, with no anticipation of their sinking there, the possibility of that event, and of consequent injury which might or not have followed from it, never could have been either a cause of action, or a ground for enhancing the damages, if any, recoverable for the entry on the plaintiffs' land. The fact that by a casualty not expected and for which no blame is attributable to the defendants or their agents, the boats were afterwards sunk, causing ultimate inconvenience and damage to the plaintiffs, cannot have a retroactive operation, either to make the previous position of the boats an injury to the rights of the plaintiffs, or to enhance the injury if it be one, of having entered upon the plaintiffs' close and used it

*4. That an individual navigating the Ohio stopped his coal boat over a log-way which the plaintiff, the owner of the adjacent soil, had projected into the river, was not an act of which the plaintiff could complain, except for the mere entry on land to cable to the shore, if the plaintiff was entered upon while using the rail-way himself, and if while there the boat was sunk by unavoidable casualty, without fault of the owner, damages for any obstruction to plaintiff's use of his log-way could not be recovered.*

for making and keeping the boats fast to the shore. This injury to the close being in itself but trivial, amounting at most to a violation of legal right, attended neither with actual damage to the close, nor any circumstance of aggravation, it may be excused by a slight necessity arising in the legitimate course of navigation. And as it should not be enhanced by the retroactive operation of the damage caused by the subsequent calamity, so neither should it have a prospective operation to change the calamity itself into a wrong. If the boats had not been sunk by the ice, but had proceeded on their voyage when the river became clear, the plaintiffs would have sustained no actual damage from the occupation of the river in front of their log-way while it could not have been used on account of the cold weather and ice, and but little even if it might have been used for a day or two, notwithstanding these causes; and no damage was in fact done to the close itself by fastening the boats to it, and keeping them there. And comparing, upon the facts now appearing, the nature of the injury and its probable consequences at the time, with the circumstances under which the managers of the boats sought this place of refuge for them, and fastened them to the shore, we think the acts are fairly attributable to the exigencies of navigation, which, though they may not exempt the defendants from making compensation for their use of another's property, and for any actual damage caused thereby, excuses them from all further responsibility.

The defendants do not deny that they knew of the existence of the plaintiffs' log-way, and understood the purpose for which it was intended, and the use to be made of the adjacent river, but they deny that they were warned to remove their boats from the position in which they had been placed. And although it is proved by one of the laborers of the plaintiffs that he, acting under their general direction to keep off boats from the front of their landing

and log-way, warned some of the hands on these boats to remove them soon after he first saw them; he also states that they denied his authority to require such removal, and it does not appear that the managers or commanders of the boats ever knew of this requirement, or that it was ever repeated to them. or even to the ordinary hands. And as the warning seems to have referred only to the situation of the boats with respect to the log-way, the inference is that it was made in the assertion of a right to the adjacent river, which did not exist except while it was in use. And the failure to repeat the requirement in a more formal manner to the managers of the boats, which retained their position for several weeks before they sunk, tends not only to confirm the inference that they did not, during that period, obstruct the actual use of the log-way, nor produce any real inconvenience or damage, but, also, to prove that the plaintiffs, aware of the necessity which had brought them into that situation, acquiesced in it, and would have made no complaint, if instead of being sunk, they had gone away when the ice broke up, and as soon as their log-way might have been used.

If, as we have assumed, the position of the boats caused no actual damage to the plaintiffs before they were sunk, or was such as the exigencies of the case justified or excused, the plaintiffs were entitled to recover nothing for the technical breach of their close —nothing for the use of their landing, except such wharfage as they may have had a right to charge— nothing for the position of the boats in front of their log-way, unless they obstructed, without reasonable necessity, the actual use which would otherwise have been made of it; and if there was no unjustifiable or unnecessary obstruction to such use before the boats were sunk, and if the sinking was not attributable to the fault of the defendants, the plaintiffs had no right to recover for any subsequent loss or damage occasioned thereby, except for the actual ob-

struction to the use of their log-way, and the consequent loss or damage to themselves after the obstruction might have been removed by the use of ordinary diligence. It is, indeed, contended that the plaintiffs ought not to recover for any loss to themselves occasioned by the calamity sustained by the defendants without fault on their part, and that if they suffered inconvenience from the sunken boats, they might and should have removed them. But the principles just laid down do exempt the defendants from liability for the damage to the plaintiffs necessarily consequent upon the calamity of the defendants, who are only made responsible for improper delay in removing the obstruction which, for their own benefit, they undertook to remove. And although the plaintiffs might have removed it themselves for and at the charge of the *defendants*, or might have aided them in doing it, they were not bound to assume a burthen which the defendants undertook for themselves; and their failure to co-operate, though it may tend to show that they were suffering no intolerable grievance from the obstruction, does not impair their right to recover for the loss actually sustained by reason of the negligence of the defendants in performing the duty which they had undertaken.

The instructions given to the jury, though based substantially upon the principles of the former opinion, seem not to have made the discriminations which, according to the principles of this opinion, the circumstances detailed in evidence required. and upon which the right and extent of the recovery should have been made to depend. The verdict rendered under these instructions is, therefore, not to be relied on as doing justice between the parties, and a new trial should have been awarded.

Wherefore, the judgment is reversed, and the cause remanded for a new trial in conformity with the principles of this and the former opinion.